# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SAROYA MARROW,

      Plaintiff,

v.                                                      Case No. 8:23-cv-2959-KKM-LSG

E.R. CARPENTER COMPANY, INC.
d/b/a CARPENTER CO.,

      Defendant.

_____

## ORDER

     Saroya Marrow alleges that E.R. Carpenter Co., Inc., her former employer, failed to provide a sufficient notice of continuing healthcare coverage, in violation of the Employee Retirement Income Security Act (ERISA), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). Am. Compl. (Doc. 14). After consideration of the parties' papers regarding Marrow's evidence for standing, I conclude that Marrow lacks standing. Accordingly, I dismiss her action without prejudice.

## I.    BACKGROUND

     Carpenter employed Marrow until March 9, 2022, when she was terminated for reasons other than gross misconduct. Am. Compl. ¶¶ 24–25. While she was employed, Marrow obtained medical insurance for herself under Carpenter's health plan. *Id.* ¶ 24; (Doc. 53-3) at 2. Because Carpenter sponsors

and administers a health plan for its more than twenty employees, Am. Compl ¶ 7, Carpenter must, under COBRA, provide "each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event," which includes termination for reasons other than gross misconduct, with the choice "to elect, within the election period, continuation coverage under the plan," 29 U.S.C. §§ 1161(a), 1163(2). This notice must be issued in "accordance with regulations prescribed by the Secretary [of Labor]." *Id.* § 1166(a); *see* 29 C.F.R. § 2590.606-4.

Carpenter mailed Marrow a COBRA notice about one week after her termination, Am. Compl. ¶ 27; *see* Notice (Doc. 14-1), but Marrow alleges that Carpenter failed, for multiple reasons, to comply with the governing regulations, *see, e.g.*, Am. Compl. ¶¶ 19, 38–56. As a result of Carpenter's non-compliance, Marrow alleges that she did not elect COBRA coverage and suffered both economic and informational injuries. *Id.* ¶¶ 20–23, 31–33.

On August 18, 2025, I denied Marrow's motion for class certification because issues of individualized standing precluded certification. Order (Doc. 54). In the same order, I directed Marrow to submit evidence proving that she has standing to sue. *Id.* at 15. Marrow argues that she has standing and relies on exhibits. Pl.'s Resp. (Doc. 55). Carpenter counters Marrow's arguments. Def.'s Resp. (Doc. 58).

## II.  LEGAL STANDARD

Article III limits the jurisdiction of federal courts to "Cases" and "Controversies," *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. CONST. art. III, § 2, cl. 1); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992), thereby "confin[ing] the federal courts to a properly judicial role," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). As such, federal courts must independently assure themselves that they have jurisdiction over a case at every stage, regardless of whether the parties raise the issue or agree that jurisdiction exists. *See Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 324 (2008); *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020). "Federal courts have an obligation to examine *sua sponte* their own jurisdiction over a case, notwithstanding the contentions of the parties" because "subject-matter jurisdiction underlies a court's power to hear a case." *DeRoy v. Carnival Corp.*, 963 F.3d 1302, 1311 (11th Cir. 2020).

The party invoking federal jurisdiction bears the burden of proving standing. *Lujan,* 504 U.S. at 561. Moreover, each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* Therefore, at the summary judgment stage, the plaintiff can no longer rest on " 'mere allegations,' but must 'set forth'

by affidavit or other evidence 'specific facts,' which . . . will be taken to be true."
*Id.* (citation modified).

## III.   ANALYSIS

Marrow fails to identify any evidence that her injuries are traceable to the deficiencies in the COBRA notice that she received from Carpenter. Thus, she lacks standing to sue and I must dismiss her action without prejudice.

### A. Injuries-In-Fact

To establish standing, the burden is on a plaintiff to show that that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. In her amended complaint, Marrow alleges both informational and economic injuries. Am. Compl. ¶¶ 21–23, 31, 32–36. Precedent makes clear that informational injury alone is insufficient to convey standing. *See TransUnion LLC*, 594 U.S. at 442 ("An 'asserted informational injury that causes no adverse effects cannot satisfy Article III.' " (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)); *Klein v. Receivable Mgmt. Grp., Inc.*, 595 F. Supp. 3d 1183, 1192 (M.D. Fla. 2022) ("To establish a concrete harm under an informational injury theory, a party asserting federal jurisdiction must show both that the plaintiff's injury was 'real' (that there were 'downstream

consequences') and that Congress made it 'legally cognizable' by seeking to ameliorate the plaintiff's harm through a statute." (quotation omitted)).

At the class certification stage, despite having alleged downstream consequences of her informational injury—loss of health and dental insurance,[1] resulting medical bills, and canceled dental procedures—Marrow had not produced evidence of these injuries. *See* Order at 6–10. Marrow claims that her economic injuries are loss of health and dental insurance, resulting medical bills, and a delayed dental procedure. Pl.'s Resp. at 8–10. For the first time, Marrow submits some evidence of her injuries.

In support of her asserted loss of insurance, Marrow claims to have been mistaken when she testified that she was on Medicaid after Carpenter terminated her employment. *See* Pl.'s Resp. at 3–4; Marrow Dep. (Doc. 53-1) 41:14–17. Marrow offers in support what she describes as a letter from Medicaid indicating that she was not eligible for Medicaid following her departure from Carpenter, *see* (Doc. 55-4). Marrow also provides two bills for a visit to an emergency room on March 12, 2023. (Doc. 55-2). Lastly, she submits records from her dentist that show that she called her dentist on January 10, 2022, to inquire about costs for a previously canceled dental procedure and

---

[1] Marrow now concedes that she was mistaken when she claimed that her children's loss of health insurance and later resulting medical bills were a result of the deficiencies in Carpenter's COBRA notice. Pl.'s Resp. at 3–4 n.1. Thus, only Marrow's loss of insurance is at issue.

indicated that she would call back to schedule the procedure, (Doc. 55-3) at 3, which she never did because she lost dental insurance after her termination, Pl.'s Resp. at 10.

I need not decide if Marrow's evidence establishes that she suffered injuries-in-fact through her loss of health and dental insurance, medical bills, and delayed dental procedure because she has produced no evidence that, even if so, these injuries are traceable to the deficiencies in Carpenter's COBRA notice. Thus, I proceed with the assumption that Marrow was not on Medicaid after Carpenter terminated her and that this loss of health and dental insurance and the resulting medical bills and delayed dental procedure are injuries-in-fact.

### B. Traceability

"Article III standing requires a 'causal connection between the injury and the conduct complained of' -- in other words, the injury must be 'fairly traceable to the challenged action of the defendant.'" *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) (quoting *Lujan*, 504 U.S. at 560). A plaintiff cannot show that their injuries are fairly traceable to the challenged conduct of the defendant when the injuries are self-inflicted or caused by the independent action of a third party that is not before the court. *See id.*; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013); *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288–89 (11th Cir. 2012). Thus, if a plaintiff would

6

have suffered " 'precisely the same' harm" if the defendant had not engaged in the alleged misconduct, there is no standing. *See Walters v. Fast AC, LLC*, 60 F.4th 642, 651 (11th Cir. 2023) (quoting *Cordoba*, 942 F.3d at 1272).

While "the traceability requirement is less stringent than proximate cause," *Cordoba*, 942 F.3d at 1271, and a plaintiff "is not required to prove causation beyond a reasonable doubt or by clear and convincing evidence," *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003), the plaintiff must, at the summary judgment stage, set forth *some* specific facts "demonstrat[ing] *factual* causation between [her] injuries and the defendant's misconduct." *See Walters*, 60 F.4th at 650; *Lujan*, 504 U.S. at 560–61.

Because Marrow's injuries are either the loss of insurance itself or medical bills and delayed procedures caused by the loss of insurance, Marrow must set forth specific facts causally connecting the deficiencies in Carpenter's notice to her failure to elect to continue insurance coverage. She does not.

Although she originally alleged six purported deficiencies[2] in Carpenter's COBRA notice, Marrow now relies on just two: omitting "when the election

---

[2] Marrow originally alleged that the notice was also deficient because it failed to include the specific amount that she needed to pay to elect continuation coverage and failed to enumerate "the amount, if any, that each qualified beneficiary will be required to pay for continuation coverage." *See* Am. Compl. ¶¶ 52–53. For the reasons given in my order denying Carpenter's motion to dismiss, these are not, in fact, deficiencies. Order Denying MTD (Doc. 30) at 14–15. Marrow also identified the fact that the notice's sixty-day election period ran from the date that the coverage

7

form was actually due" and "including conflicting statements regarding whether the initial payment had to accompany the election form." Pl.'s Resp, at 11; *see also* Am. Compl. ¶¶ 41, 47–51. Marrow argues that her case is like *Walters*, 60 F.4th 642, because, in both, "a statutory violation cause[d] the very harm Congress sought to prevent." Pl.'s Resp. at 12. Marrow misses that, in *Walters*, there was an identifiable causal connection between the violation— failure to provide disclosures about the cost of the loan—and the harm— accepting a loan that, "had he received the proper disclosures, the [plaintiff] would not have accepted." *Walters*, 60 F.4th at 645.

Unlike in *Walters*, where "evidence establishe[d]" that Walters accepted the loan because the true price was hidden from him, *id.* at 651, Marrow provides no evidence of how either of the deficiencies led to her failure to elect to continue coverage. Instead, Marrow points in the general direction of her conclusory testimony that she was confused by the notice without explaining or providing evidence of how her confusion prevented her from electing coverage. *See* Pl.'s Resp. at 11–14. Marrow simply never connects any deficiency about when the election form or initial payment was due to her failure to elect.

---

terminated rather than the date of the election notice, Am. Compl. ¶ 44, and alleged, cumulatively, that the notice was not "written in a manner calculated to be understood by the average plan participant," *id.* ¶ 56 (quoting 29 C.F.R. § 2590.606-4(b)(4)). Marrow has abandoned her arguments as to these purported deficiencies.

While Marrow testified, for example, that she was "automatically confused" by aspects of Carpenter's notice, such as why her children were not included in the notice or why Carpenter wanted her election payment to be mailed to its warehouse, *see* Marrow Dep. 78:2–4, 18–22, these statements do not explain how her injuries are traceable to the specific deficiencies that she now relies on. Marrow also initially testified that, even though she could afford the election payment, she did not elect to continue her insurance because she was "looking at the papers and confused the whole time." *See id.* 82:14–23. When asked additional questions to ascertain the source of her confusion, Marrow testified that she had the money to pay, knew that she would have to pay to elect coverage, was informed by the notice that she had sixty days to elect, and was "well within" the sixty-day window. *Id.* 83:4–21. In fact, when asked if she "could have sent it in if [she] elected coverage," Marrow testified that she could have and that the amount was the source of her confusion:

> Q. And so you could have sent it in if you elected coverage, correct?
> A. Correct.
> Q. Okay. Your confusion is –
> A. The amount.
> Q. – the amount because you disagreed, you thought your daughters should have been included on your coverage; is that correct?
> A. Correct.

*Id.* 83:22–84:5.

Marrow presents no evidence of any actions that she took or failed to take because of the specific deficiency about the election due date. She did not attempt to elect coverage too late; she did not attempt to elect coverage at all. She did not mistakenly believe the notice's lack of a due date meant there was no deadline to elect coverage. She has not provided evidence that she acted in reliance on the lack of a due date. While the notice omitted the date an election was due, it informed her that there was a limited window in which she must elect coverage. She understood that and was well within that window when she understood it. *See id.* 83:4–21. Yet, Marrow did nothing.

As a logical consequence, the notice's contradictory statements about when the election payment was due could not have caused any harm to Marrow when she did not attempt to elect coverage. Marrow has not provided evidence that she chose to forgo coverage based on a misunderstanding of when she would have had to first pay. In fact, Marrow testified that she had the money. *Id.* 83:19–21.

Marrow now attempts to partially undermine her testimony that she had sufficient funds to pay for coverage, though she does so in argument and not through evidence or sworn statements. *See* Pl.'s Resp. at 13–14. Instead, Marrow points to deposition testimony, which she did not provide to the Court, where she purportedly stated that she had access to money that belonged to both her and a romantic partner. *Id.* at 13. Marrow argues that, because the

10

money was not all hers and she had other expenses, "she could have afforded the first premium if properly informed, but the notice denied her the statutory grace period to plan financially." *Id.* at 14. In response, Carpenter points to deposition testimony, which it did not provide to the Court, that Marrow started dating the individual in 2024—well beyond the relevant time. Def.'s Resp. at 2 n.2. Thus, Carpenter contends, the "$50,000 in savings" that Marrow had at the relevant time must have belonged to her alone. *Id.* Even crediting her purported deposition testimony that she jointly owned the savings, Marrow's argument is insufficient because she still provides no evidence of a causal connection between the notice's contradictory statements about when to make the first payment and Marrow's failure to elect coverage. *Cf. Carter v. Sw. Airlines Co.*, No. 8:20-CV-1381-T-02JSS, 2020 WL 7334504, at *7 (M.D. Fla. Dec. 14, 2020) (no standing when the plaintiff "fails to explain how these alleged deficiencies led to her inability to understand the notice in a way that impeded her decision to elect or not elect COBRA coverage"); *Bryant v. Wal-Mart Stores, Inc.*, No. 16-24818-CIV, 2020 WL 4333452, at *14 (S.D. Fla. July 15, 2020) (no standing for plaintiff who claimed that "the alleged deficiency in the COBRA notice caused her to lose coverage" but "was unable to explain how or why").

Rather than demonstrate that the notice's deficiencies caused Marrow's injuries, the evidence shows only that her injuries were self-inflicted. In

11

addition to identifying that her confusion was rooted in her mistaken belief that her children should be included in the notice, Marrow Dep. 83:22–84:5, Marrow also testified that the request that her election payment be mailed to Carpenter's warehouse caused her to refrain from acting: "I wasn't sure about [sending the payment to the warehouse]. So I was just like [']I'm not doing that.['] " *Id.* 78:24–25. Thus, even if Carpenter's notice contained the due date and correctly instructed Marrow of when to make her first payment, Marrow's testimony establishes that her issues with these non-deficient portions of the notice would have prevented her from electing coverage. Marrow's injuries are traceable only to herself. A non-deficient notice would have resulted in "precisely the same harm." *See Walters*, 60 F.4th at 651 (citation modified).

Because Marrow has not set forth any evidence demonstrating factual causation between her injuries and the notice's deficiencies, she has failed to show that her injuries are fairly traceable to Carpenter's misconduct. Thus, she lacks standing.

## IV.    CONCLUSION

Accordingly, the following is **ORDERED:**

1. This action is **DISMISSED without prejudice.**

2. The Clerk is directed to **TERMINATE** any pending motions and deadlines, **ENTER JUDGMENT** that shall read, "This case is dismissed without prejudice," and **CLOSE** this action.

**ORDERED** in Tampa, Florida, on November 18, 2025.

Kathryn Kimball Mizelle
United States District Judge